IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RIVER STATES TRUCK AND TRAILER, INC.,

                    Plaintiff,

    v.                                          OPINION and ORDER

DAIMLER VANS USA LLC and                        20-cv-1089-jdp
MERCEDES-BENZ USA LLC,

                    Defendants.

Through subsidiaries, the German automaker Mercedes-Benz distributed Sprinter vans under both the Freightliner and Mercedes-Benz brands through separate dealer networks. But it decided to discontinue the Freightliner-branded Sprinter vans and terminate the Freightliner dealerships. Plaintiff River States Truck and Trailer, Inc., the owner of terminated Wisconsin Freightliner dealerships, has sued Daimler Vans USA, LLC, alleging that the termination of its dealerships violates Wisconsin's Motor Vehicle Dealer Law. River States also sued Mercedes-Benz USA LLC, the parent company of Daimler Vans USA, LLC, for refusing to grant River States a franchise that would permit it to sell the Mercedes-Benz Sprinter vans, which, except for branding, are identical to the Freightliner vans.

Wisconsin's Motor Vehicle Law prohibits unjustified dealership terminations, but it allows termination prompted by the discontinuation of entire "line-makes." The central dispute is whether Daimler Vans terminated an entire line-make, as defendants contend, or whether it has terminated only certain models, as River States contends. The parties agree that what constitutes a "line-make" is a question of branding. The decisive issue is whether the line-make at issue is Sprinter vans or only Freightliner Sprinter vans. Both sides move for summary judgment. Dkt. 54 and Dkt. 60.

The court agrees with defendants that the line-make at issue is Freightliner Sprinter vans. That view is consistent with River States' dealership agreements, which granted rights only to Freightliner Sprinter vans; River States never had any right to distribute Mercedes-Benz Sprinter vans. That view is also consistent with the weight of authority from courts and administrative bodies that have considered similar issues. Accordingly, the court will deny River States' motion and will grant defendants' motion.

Also before the court is Daimler Vans' motion for leave to amend its answer to add a counterclaim for declaratory relief regarding its compliance with the notice and compensation provisions relating to line-make terminations. Dkt. 111. The motion will be denied because Daimler Vans waited too long to add its counterclaim to this case.  The River States dealership termination is governed by applicable provisions of Wisconsin's Motor Vehicle Dealer Law. If the parties dispute whether Daimler Vans complies with those provisions, that is a matter that will have to be addressed in a new suit.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

## A.  The parties and background

Plaintiff River States Truck and Trailer is a Freightliner truck dealer with three motor vehicle dealerships in Wisconsin. In 2010, River States entered into dealership agreements with defendant Daimler Vans USA, LLC (Daimler Vans) to sell Freightliner branded Sprinter vans at two of its dealerships. At the time, Daimler AG[1], through its various subsidiaries,

---

[1] Daimler AG was renamed as Mercedes-Benz Group AG in February 2022. Its former truck division, Daimler Trucks, became a separate public company in December 2021. The recent corporate reorganization is immaterial to the outcome of the parties' motions for summary

manufactured and distributed Sprinter vans, which were branded in the United States as either Freightliner or Mercedes-Benz vans. Daimler Vans distributed the Freightliner Sprinter vans to a network of Freightliner dealers, and defendant Mercedes-Benz USA, LLC (Mercedes), distributed the Mercedes-Benz Sprinter vans to a network of Mercedes-Benz commercial vehicle dealers.

All Sprinter vans were manufactured in the same factories and were physically identical, except for the badging on the vehicles. Freightliner Sprinters had a Freightliner logo on the back of the vehicle and on the front grille, steering wheel, and gearshift knob. Mercedes-Benz Sprinters had a Mercedes-Benz three-pointed star logo on the back of the vehicle and on the front grille, steering wheel, and gearshift knob. The Sprinter vans sold by the Freightliner and Mercedes-Benz dealers were available in various specifications and styles, including cargo vans, passenger vans, crew vans, and chassis cabs.

## B.  Dealer agreements

Freightliner dealers, including River States, were authorized to sell only Freightliner Sprinter vans, and not Mercedes-Benz branded vehicles, pursuant to their commercial vehicle dealer agreements with Daimler Vans. Dkt. 22-1. River States' dealer agreement with Daimler Vans authorized River States to sell "contract goods," which were defined in the agreement as the goods that Daimler AG had authorized Daimler Vans to distribute pursuant to a separate distribution agreement. The separate distribution agreement authorized Daimler Vans to distribute Sprinter vans badged with the Freightliner mark, identified specifically as "Freightliner Sprinter" in Annex 1 to the distributor agreement. Dkt. 62-1, at 32. Annex 2 to

_____

judgment.

the agreement also stated that Daimler Vans was designated as the distributor of "Freightliner Sprinter Vans," and no other goods. *Id.* at 33.

River States and other Freightliner Sprinter dealers agreed to follow operations and marketing guidelines provided by Daimler Vans. *See* Dkt. 67-6 (Commercial Vehicles Operations Guidelines); Dkt. 63-2 (Freightliner Sprinter Communication Standards). The guidelines required dealers to display signage at their dealerships that included the Freightliner logo and stated that the dealers were certified Sprinter dealers. But Freightliner Sprinter dealers were not required to build or maintain specific dealership facilities. Daimler Vans permitted River States and other Freightliner dealers to sell Freightliner Sprinters out of their preexisting facilities, which typically were built to sell and service heavy trucks.

Mercedes-Benz commercial vehicles dealers were authorized to distribute only Mercedes-Benz badged vans pursuant to their dealer agreements with Mercedes. Mercedes's distributor agreement with Daimler AG authorized Mercedes to distribute two models of "Mercedes-Benz Commercial Vans," the Sprinter van and the Metris van. Dkt. 62-3, at 33; Dkt. 62-4, at 5. Mercedes required Mercedes-Benz commercial vehicle dealers to build and maintain Mercedes-Benz image-compliant facilities using specific branding elements, color schemes, and building materials. Mercedes-Benz commercial vehicle dealers were required to display signage at their dealerships that displayed the Mercedes-Benz logo and that stated that they were certified Mercedes-Benz commercial vehicle dealers.

## C. Discontinuation of the Freightliner Sprinter and River States' Sprinter franchises

Mercedes managed the Sprinter business for both Mercedes and Daimler Vans. Daimler Vans did not have full-time employees of its own, so Mercedes' employees handled the volume and strategic planning, ordering, logistics, distribution, servicing, and marketing of both

Mercedes-Benz Sprinters and Freightliner Sprinters. Starting in 2019, Mercedes considered strategies to reduce the complexity of the commercial vans part of its business and, in particular, it evaluated the costs and benefits of manufacturing and distributing the Freightliner Sprinter. At the time, Mercedes-Benz Sprinters accounted for approximately 90% of Sprinter sales in the United States. Mercedes considered Freightliner Sprinter's customers and its geographic markets, and it considered whether Freightliner customers would switch to the Mercedes brand. In summer 2019, Mercedes engaged the Wharton School of Business to evaluate whether Sprinter vans should remain under two brand names, or whether only Mercedes should distribute the vans.

The following year, Daimler AG decided to discontinue manufacturing the Freightliner Sprinter. (The parties dispute whether Daimler AG, Mercedes, or another entity was primarily responsible for the decision to discontinue the Freightliner Sprinter, but the dispute is immaterial to the outcome of the parties' motions.) On August 18, 2020, Daimler Vans notified River States that the Freightliner Sprinter was being discontinued, and that Daimler Vans would no longer sell Sprinter vans for resale. Dkt. 22-2. The letter stated that production of the Freightliner Sprinter would stop in September 2021, and that all new retail sales had to be completed by December 31, 2021. Daimler Vans offered to pay River States $75,000 for the loss of its Sprinter franchises.

River States rejected Daimler Van's offer of $75,000, stating that River States' Sprinter sales contributed more than $500,000 each year to its net profits. River States requested that it be granted a Mercedes-Benz Sprinter dealership so that it could continue selling Sprinter vans. In some geographic areas that would no longer have a Sprinter dealer, Mercedes offered Mercedes-Benz commercial vehicle dealerships to existing Mercedes passenger car dealers and

Freightliner truck dealers. But Mercedes denied River States' request for a Mercedes-Benz commercial vehicle dealership. River States then filed this lawsuit, in December 2020.

In June 2021, Daimler Vans served River States with formal notices that its Sprinter van franchises would be cancelled at the end of the year. The notices purported to comply with Wis. Stat. § 218.0132(2), which details the procedure by which a distributor (such as Daimler Vans) may cancel a franchise when it discontinues an entire line-make of vehicles. The notices stated that Daimler Vans had good cause to terminate the dealer agreements because "the distribution of Freightliner Sprinter vehicles will be discontinued." Dkt. 65-7.

The court has diversity jurisdiction under 28 U.S.C. § 1332. River States is a citizen of Wisconsin. Daimler Vans USA LLC's sole member is Mercedes-Benz USA, LLC. Mercedes-Benz USA, LLC's sole member is Daimler North America Corporation, which is a Delaware corporation with its principal place of business in Michigan. The amount in controversy exceeds $75,000.

ANALYSIS

A.  **River States' claims**

The Wisconsin Motor Vehicle Dealer Law is intended to protect motor vehicle dealers from unfair treatment by auto manufacturers. *Forest Home Dodge, Inc. v. Karns*, 29 Wis. 2d 78, 85, 138 N.W.2d 214 (1965). River States contends that defendants violated § 218.0116(1)(i) of the law by canceling its Freightliner Sprinter franchises without "just provocation," and by refusing to grant it Mercedes-Benz Sprinter franchises.[2] River States says that Mercedes is

---

[2] River States withdrew its claim that defendants unfairly allocated vehicles between Freightliner and Mercedes dealers. Dkt. 86-3, at 2.

replacing Daimler Vans as the distributor of the "Sprinter line-make," so Mercedes is obligated under of the law to continue the franchises that Daimler Vans granted to River States. River States has moved for summary judgment on its claims that (1) defendants' cancellation of its Sprinter franchises violated the motor vehicle dealer law, and (2) the cancellation was willful.

Defendants have moved for summary judgment on all of River States' claims, arguing that Daimler Vans' cancellation of River States' Freightliner Sprinter franchises fell under the statutory provisions for market withdrawal of a motor vehicle line-make. Specifically, the cancellation or nonrenewal of a franchise is not a violation of the motor vehicle dealer law if the distributor complies with several requirements, including notice and compensation requirements, and if the manufacturer or distributor "contemporaneously cancels or fails to renew every franchise for the same *line make* granted to any dealer or distributor in the United States." Wis. Stat. § 218.0132(2) (emphasis added). *See also Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 138, n.4 (7th Cir. 1990) (franchise laws permit complete market withdrawal because "market withdrawals carry little chance of unfair dealing"); *Mid-State Truck Service v. General Motors Corp.*, 1988 WL 148432, at *9 (W.D. Wis. 1988) ("a nondiscriminatory product market withdrawal" does not violate the motor vehicle dealer law).

The parties agree that the cancellation provision under which River States brings its claims, § 218.0116(1)(i), is expressly subject to the provisions for line-make withdrawals under § 218.0132. *See* Wis. Stat. §§ 218.0116(1)(i)(2); 215.0132(1)(a). They also agree that there are no genuine disputes of material facts regarding whether Daimler Vans' cancellation of all Freightliner Sprinter franchises qualified as a "line-make withdrawal." But the parties disagree about whether the discontinuation of the Freightliner Sprinter constituted a "line-make withdrawal." Defendants argue that it did, so River States' claims for unlawful cancellation

7

must fail. They also argue that because Mercedes was not and will not be a distributor of the Freightliner Sprinter, Mercedes did not violate the law by refusing to grant River States a Sprinter franchise. River States disagrees, arguing that "Sprinter" is the relevant line-make, that the Freightliner Sprinter and Mercedes-Benz Sprinter are part of the same line-make, and that defendants cannot rely on § 218.0132 because they are not canceling or failing to renew an entire line-make.

The parties' dispute turns on the meaning of "line-make," and on whether Freightliner Sprinters and Mercedes-Benz Sprinters were part of the same motor vehicle line-make. Wisconsin's Motor Vehicle Dealer Law does not define "line-make." But as discussed below, references to "line-make" in the statute, as well as the parties' dealer agreements, industry standards, and legal authority support defendants' position that line-make refers to the brand of vehicles that the franchisee was authorized to distribute. In this case, the relevant line-make was Freightliner Sprinters, so Daimler Vans' cancellation of River States' franchise constituted a line-make withdrawal under the motor vehicle dealer law.

**B. The parties' dealer agreements**

The motor vehicle dealer law does not define "line-make," but the statute uses the term line-make to define "franchise": "the right to buy, sell, distribute or service *a line make of motor vehicles* that is granted to a motor vehicle dealer or distributor by a manufacturer, importer or distributor." Wis. Stat. § 218.0101(13) (emphasis added). The statute further requires distributors to offer franchised dealers "*all* models manufactured or distributed for the line make." *Id.* § 218.0116(1)(v) (emphasis added).

The parties agree that Daimler Vans granted River States two "franchises" under § 218.0101(13) to sell commercial vans. *See* Dkt. 13, Am. Cpt., ¶ 14. Based on the statutory

8

language, it follows that Daimler Vans granted River States franchises to sell a "line-make of motor vehicles." The parties' dealer agreements do not use the term "line-make," and River States argues that the dealer agreements should not determine the relevant "line-make." But River States' president, Joseph Laux, testified that dealer agreements can determine the scope of a line-make. Specifically, he testified that whether a vehicle was part of a specific line-make "kind of goes by contracts, by dealer agreement contracts," and that "separate contracts" make "separate line-make[s]." See Dkt. 53 (Laux Dep. at 116–18). In addition, as defendants point out, if the dealer agreements granted valid franchises under the motor vehicle dealer law, the agreements must have granted River States the right to distribute all of the models in a line-make. Under the plain language of River States' dealer agreements, defendants argue, that line-make was Freightliner Sprinters, because the dealer agreements authorized River States to sell "contract goods," which were specifically defined as "Freightliner Sprinters."

Defendants' arguments are persuasive. The dealer agreements are unambiguous, and they authorized River States to sell only Freightliner Sprinters, so "Freightliner Sprinters" was the relevant line-make for purposes of the motor vehicle dealer law. Any other interpretation would render meaningless the description of "contract goods" provided in the agreements. *See Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 45, 326 Wis. 2d 300, 320, 786 N.W.2d 15, 25 ("When possible, contract language should be construed to give meaning to every word, avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.").

There is no genuine dispute about the scope of the dealer agreements. For more than 10 years, River States operated as if Daimler Vans had granted it the right to sell only Freightliner Sprinter vans. River States understood that it was obligated to follow the

marketing guidelines for Freightliner Sprinter dealers, and not those for Mercedes-Benz dealers. River States never sold a new Mercedes-Benz Sprinter, never marketed Mercedes-Benz Sprinters, and knew that it had no right to sell Mercedes-Benz Sprinters because Mercedes-Benz vehicles were outside the scope of its dealer agreements with Daimler Vans. *See* Dkt. 53 (Laux Dep. at 38–39, 92) (River States' president testifying that River States was not authorized to sell Mercedes-Benz vehicles). If Freightliner Sprinters and Mercedes-Benz Sprinters were part of the same line-make, as River States now argues, then River States should have been permitted to sell Mercedes-Benz Sprinters pursuant to their dealer agreements. But there is no evidence that River States ever complained or suggested that its dealer agreements violated the motor vehicle dealer law or created unlawful franchises by failing to permit River States to sell all of the vehicles in the so-called "Sprinter line-make."

River States does not address the conflict between the language in its commercial dealer agreements with Daimler Vans, the definition of "franchise" under the motor vehicle dealer law, and its argument that it should be granted a franchise to sell Mercedes-Benz Sprinters. River States does not argue that its commercial dealer agreements with Daimler Vans were invalid, or that there is a way to interpret the agreements to comport with the franchise requirements of the statute. River State's arguments largely disregard the actual language of its dealer agreements. But the court cannot disregard the parties' contracts. *See Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 247–48, 593 N.W.2d 445, 451–52 (1999) (court's role is "to hold parties to that agreement so that each receives the benefit of his or her bargain"). The court must interpret and enforce those contracts as they relate to the motor vehicle dealer law, which is the statute under which they were executed.

The Court of Appeals for the Seventh Circuit addressed a similar situation in a case involving a construction equipment franchise. *FMS, Inc. v. Volvo Const. Equip. N. Am., Inc.*, 557 F.3d 758, 764 (7th Cir. 2009). Under the Maine franchise law at issue, a manufacturer could terminate a franchise agreement if the manufacturer discontinued the "production or distribution of the franchise goods." *Id.* at 762. The parties disputed whether "franchise goods" included only the Samsung-brand equipment that the franchisee had been authorized to sell under its dealer agreement, or if "franchise goods" included Samsung equipment that had been rebranded with the Volvo trademark. The court considered the dealer agreement in relation to the franchise statute. The statute defined "franchise" based on the grant of a license to use the franchisor's trademark or trade name in the marketing of goods or services. Because the dealer agreement permitted the franchisee to sell only Samsung-brand equipment, the "franchise goods" for purposes of the Maine franchise law included only Samsung-brand equipment. Discontinuation of the Samsung-brand line of equipment was a discontinuation of the "franchise goods" under the statute, so Volvo did not violate the statute by terminating the franchise agreement and declining to grant the plaintiff a Volvo franchise. *Id.* at 764.

In this instance, the motor vehicle dealer law defines "franchise" based on the grant of a right to buy, sell, distribute, or service a line-make of motor vehicles. Because the dealer agreement permitted River States to sell only Freightliner Sprinters, the "line-make" for purposes of the statute included only Freightliner Sprinters. Discontinuation of Freightliner Sprinters was a discontinuation of a line-make under the statute, so defendants did not violate § 218.0116(1)(i) by terminating the franchise agreement or declining to give River States a Mercedes-Benz franchise. Nothing in the statute required defendants to grant River States a new franchise to sell vehicles from a line-make for which it was never an authorized dealer. *See*

*also Subaru Distributors Corp. v. Subaru of Am., Inc.*, No. 03 CIV. 9608SCR, 2004 WL 3220120, at *6 (S.D.N.Y. June 1, 2004) (Subaru vehicles that were "re-badged" as Saab vehicles were not the Subaru vehicles that the plaintiff had the contractual right to distribute, because, even if "no physical modifications were made . . . the name change would bring the vehicles outside the purview of the [contract]").

River States argues that *FMS, Inc.* is distinguishable because it involved an equipment franchise under Maine law and not a vehicle franchise under Wisconsin law. But the court of appeals' analysis did not depend on the details noted by River States. In deciding whether a manufacturer violated the state franchise statute, the court of appeals compared the statutory definition of "franchise" to the dealership agreement at issue. The court concluded that the franchisor could withdraw a product line from the market without violating the statute, and that the dealer could not demand a franchise to sell a product that it was never authorized to sell under its dealership agreement. The general principles and reasoning are applicable to this case, even though statutory framework comes from Wisconsin rather than Maine. River States does not point to any feature of Wisconsin's statute that would require a different result.

Other legal authorities have reached similar conclusions in cases involving Sprinter vans. In the early 2000s, DaimlerChrysler AG distributed Sprinter vans under the Freightliner and Dodge brands. In *Smoky Mountain Freightliner, LLC v. DaimlerChrysler Vans, LLC*, No. 2:05-cv-00173, 2006 WL 8442968 (E.D. Tenn. Mar. 7, 2006), a Freightliner Sprinter dealer brought a claim against DaimlerChrysler Vans, LLC and Freightliner, LLC, arising from DaimlerChrysler, AG's announcement that it was going to discontinue the Freightliner Sprinter. (Daimler later discontinued the Dodge Sprinter.) The district court dismissed the Freightliner dealer's claims, stating that the dealers only ever had a franchise agreement with

12

DaimlerChrylser Vans to sell Freightliner Sprinter vans, and that they could not challenge DaimlerChrysler AG's decision "to begin selling the Sprinter vehicle under the Dodge brand and through Dodge dealers." *Id.* at *7–8.

In another case, the Motor Vehicle Dealers Board of Ohio considered a challenge brought by a Freightliner Sprinter dealer seeking to bar the establishment of Mercedes-Benz dealership that would sell Sprinter vans in the relevant market area. A hearing examiner reviewed the Freightliner dealer's franchise agreement and concluded that the Freightliner dealer could not challenge the new dealership. The examiner noted that Daimler Vans and Mercedes were separate entities that distributed separate vehicle line-makes, and that the Freightliner dealer was only authorized to distribute Freightliner Sprinters. Dkt. 69-2, *Fyda Freightliner Cincinnati, Inc. v. Daimler Vans USA LLC*, Case no. 14-02-MVDB-379-KR (Mar. 6, 2015). The Ohio Motor Vehicle Dealers Board adopted the hearing examiner's decision. Dkt. 69-5.

These decisions support the court's conclusion that River States' claims fail based on the language of its dealer agreements and Wisconsin's Motor Vehicle Dealer Law. As discussed below, River States' remaining arguments about the meaning of "line-make" are unpersuasive and do not change the court's conclusion.

## C. "Line-make" in the motor vehicle industry

Both sides agree that, if the court looks outside the parties' dealer agreements to resolve this dispute, the court should construe line-make as that term is used in the motor vehicle industry. *See State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 663, 681 N.W.2d 110, 124 ("[T]echnical or specially-defined words or phrases are given their technical or special definitional meaning.").

13

Defendants argue that line-make in the motor vehicle industry means the brand, badge, or trademark on a vehicle. For example, Chevrolet, BMW, Toyota, Dodge, and Ford are distinct line-makes, under which different models are manufactured and distributed. Defendants submitted a substantial amount of evidence to support their proposed definition, including a declaration from Larry Hice, who worked for General Motors in various positions, including as a regional general manager, from 1971 to 2008. Dkt. 61, Hice Decl., ¶¶ 3, 4, 5 (explaining that motor vehicle industry uses the terms "brand," "line-make," and "make" interchangeably, and that "line-make" generally refers to the badging or brand identification of a vehicle). Defendants also submitted documents from the National Highway Traffic Safety Administration which state that "make" refers to the "general name used by the vehicle manufacturer," such as Dodge, Ford, and Pontiac.

River States does not genuinely dispute that line-make refers to the brand or badge of a vehicle, and it agrees that several state statutes define line-make as being tied to the brand or badge of a vehicle. *See, e.g.*, Ark. Code Ann. § 23-112-103(17) ("'Line make of a motor vehicle' means a group or series of motor vehicles that have the same brand identification or brand name, based upon the manufacturer's trademark, trade name, or logo"); Colo. Rev. Stat. Ann. § 44-20-102(13) ("'Line-make' means a group or series of motor vehicles that have the same brand identification or brand name, based upon the manufacturer's trademark, trade name, or logo"); 63 Pa. Cons. Stat. § 818.102 (line-make means "groups of vehicles that are offered for sale, lease or distribution under a common name, trademark, service mark or brand name of the manufacturer or distributor of those same vehicles"); Ohio Rev. Code § 517.542(J)(2)(line-make means "a collection of models, series, or groups of motor vehicles manufactured by or for

14

a particular manufacturer, distributor, or importer that are offered for sale, lease, or distribution pursuant to a common brand name or mark").

But River States proposes that the court adopt one of the 30 definitions of "line-make" listed on the website Lawinsider.com, which it says is consistent with other statutory definitions and how the term is used in the industry.[3] The chosen Lawinsider definition of line-make is "a collection of models, a series, or a group of motor vehicles manufactured by or for a particular manufacturer, distributor, or importer that are offered for sale, lease, or distribution under a common brand name or mark." River States does not explain why the court should rely on a definition provided by a website that has no relation to the motor vehicle industry. "Law Insider is a subscription based contract database and resource center that helps over 300,000 lawyers and business owners draft and negotiate contracts more effectively."[4]

The Lawinsider definition is not actually inconsistent with the definitions provided by defendants. But the Lawinsider definition as a "collection of models" is so general and vague that it makes it hard to determine what the applicable line-make is. In any event, the court declines to adopt a general definition of "line-make," because doing so would not resolve the parties' disputes. The parties agree that "line-make" in the industry generally refers to the brand, badge, or mark of a vehicle, but they disagree about the relevant brand, badge, or mark that identifies the line-make at issue in this case. Ultimately, all of River States' arguments that "Sprinter" is the relevant mark are unpersuasive.

---

[3] See https://www.lawinsider.com/dictionary/line-make (last visited May 13, 2022).

[4] See https://www.lawinsider.com/about.

### 1.  Vehicle similarities and branding

River States says that the Sprinter vans distributed by Daimler Vans and Mercedes belonged to the same "Sprinter line-make," because they were physically identical. But River States has submitted no industry evidence, case law, or other legal authority suggesting that physical similarities between vehicles determine whether the vehicles are part of the same line-make. Instead, evidence and legal authority in the record suggests that physical similarities between vehicles is irrelevant to that question.

Defendants submitted undisputed evidence that it is a longstanding practice in the motor vehicle industry for a manufacturer to make and distribute similar vehicles with different badges. *See* Dkt. 61 (Hice Decl., ¶¶ 14–19). For example, General Motors distributed similar full and mid-size truck models under the Chevrolet and GMC brands, including Chevrolet Suburbans and GMC Suburbans, that were physically identical but had different badges. *Id. See also*, Dkt. 69-5 (*Des Moines Chrysler v. Dep. Of Trans., Office of Veh. Services*, No. 08DOTMF005, at 9, 12 (Iowa Dep't of Inspections and Appeals, Feb. 16, 2009) (concluding that Chrysler Town and Country and the Dodge Caravan are separate line-makes despite "extensive similarities")). Despite this longstanding practice, River States has cited no evidence suggesting that similar vehicles made by a single manufacturer must be part of the same line-make.

River States also argues that the Freightliner and Mercedes-Benz vans at issue were part of the same line-make because they were marked and offered for sale under the badge, brand, or trademark of "Sprinter." River States points out that Daimler AG owned the "Sprinter" trademark, and that there are no registered trademarks for "Freightliner Sprinter" or "Mercedes-Benz Sprinter." But River States cites no legal authority requiring that a particular

trademark or combination thereof be registered to constitute the brand, name, or mark that signifies a line-make. In addition, River States' argument ignores that, regardless of trademark registration status, the vans were actually marked and marketed with distinct branding that identified them as either Freightliner Sprinters, using the Freightliner trademark, or Mercedes-Benz Sprinters, using the Mercedes-Benz three-pointed star.

River States says that it frequently referred to the vans it sold as "Sprinters," without using the term "Freightliner Sprinter." It also suggests, though without evidentiary support, that Mercedes-Benz dealers did the same. This suggests that the term "Sprinter" might sometimes be used casually to describe a type of van. The Freightliner and Mercedes-Benz names and logos appear throughout the evidence submitted by the parties, including in product brochures, branding and facility guidelines, communication standards, and other materials. River State advertised the vans it sold as "Freightliner Sprinters" and "Freightliner vans" on its website and on billboards, and it identified Freightliner as the "make" of the vehicles it sold in its sales and registration paperwork for its customers and the state. Dealers of the respective brands were required to identify their facilities with appropriate branding, including Freightliner signage for Freightliner Sprinter dealers and Mercedes-Benz signage for Mercedes-Benz dealers. In light of this systematic brand identification, River States' attempt to downplay the distinct badging and marketing of Freightliner Sprinters and Mercedes-Benz Sprinters is not persuasive.

### 2. Distribution and dealership networks

River States next argues that Freightliner Sprinters and Mercedes-Benz Sprinters should be treated as part of the same line-make because the Mercedes employees managed distribution of both types of Sprinters, including managing the planning, allocation, and incentives for

Daimler Vans' dealers. Relying on the "single enterprise" theory from antitrust law, River States argues that Daimler Vans and Mercedes should be treated as the same legal entity for purpose of the motor vehicle dealer law. Dkt. 56, Plt.'s Br., at 19–20 (*citing Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (establishing that coordination between a parent and subsidiary cannot violate the Sherman Antitrust Act)). Rivers States argues that because the entities acted as a single enterprise, the Sprinters they distributed were part of the same line-make.

River States provides no legal or evidentiary support for this argument. It does not explain why, even if defendants acted as a single enterprise, this would be relevant to whether Freightliner and Mercedes-Benz vans were part of the same line-make. River States has submitted no evidence about how brands must be managed to maintain distinct identities between brands. In contrast, defendants submitted evidence and legal authority showing that it is common for a single motor vehicle company to manufacture, distribute, and manage multiple brands or line-makes. For example, Daimler AG distributed multiple different line-makes by using different subsidiaries, including Mercedes passenger cars, Mercedes commercial vans, Freightliner trucks, and Western Star trucks. *See also, Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 314 (8th Cir. 2009) (noting that General Motors manufactured and distributed multiple line-makes, including GMC, Buick, Chevrolet, Cadillac, and Pontiac).

It is undisputed that Daimler Vans and Mercedes were separate legal entities that had separate agreements with dealers and separate distributor agreements with Daimler AG. The Freightliner Sprinter dealer network was distinct from the Mercedes-Benz commercial vehicle dealer network, and both were subject to different signage obligations and branding guidelines. Mercedes-Benz commercial vehicle dealers had strict corporate image compliance requirements

18

that Freightliner Sprinter dealers were never subject to. Mercedes' management of both dealer networks is immaterial to whether the vehicles were part of the same or separate line-makes.

### 3. Sprinter models and specifications

River States argues that "Sprinter" must be a line-make, and not a "model," because there were various Sprinter models available under both the Freightliner and Mercedes-Benz brands. River States points to various Sprinter styles and specifications, such as the cargo van, passenger van, 1500 model, 2500 model, etc., as evidence that "Sprinter" must be a line-make. It argues that a model cannot have models contained within it. Plt.'s Br., Dkt. 77, at 9.

But even lay people know that many vehicle models are available in different styles and specifications. As defendants explain, the different series numbers reflect different powertrain specifications, which is common in the motor vehicle industry. For example, River States acknowledges in its brief that "Chevrolet" is a line-make, and that Suburban is model within that line make. Plt.'s Br., Dkt. 77, at 11. But according to Chevrolet's website, the following Suburban "models" are available for 2022: LS; LT; Z71; RST; Premier; and High Country.[5] River States does not argue that because the Suburban is available in different specifications, or models, that Suburban, and not Chevrolet, is the relevant line-make.

### 4. "Freightliner" line-make

River States also argues that the Sprinter vans it sold could not have been part of the "Freightliner line-make," because "Freightliner" is the line-make of heavy and medium trucks manufactured and distributed by Daimler Trucks North America. It argues that neither Daimler Vans nor Mercedes could have granted it a franchise to sell Freightliner vehicles.

---

[5] See https://www.chevrolet.com/suvs/suburban (last visited May 13, 2022).

But River States' argument is based on a mischaracterization of defendants' position. Daimler Vans has never suggested that it granted River States a general Freightliner franchise, or that Freightliner Sprinters were part of the same line-make as Freightliner trucks. Daimler Vans admits that it had no authority to grant a Freightliner truck franchise, even though it had a license to use the Freightliner trademark on Sprinter vans. Defendants instead have argued consistently that there is a distinct Freightliner Sprinter line-make and a separate Mercedes-Benz commercial vehicle line-make (that includes the Mercedes-Benz Sprinter and Mercedes-Benz Metris). And River States has cited no evidence or legal authority to support its argument that a single brand, such as Freightliner, could not encompass two or more distinct line-makes distributed and sold thorough separate sets of agreements.

## D.  Daimler Vans' motion for leave to add a counterclaim

For the reasons discussed above, the court concludes that Daimler Vans franchised River States to sell Freightliner Sprinters, which are part of a separate line-make than the Mercedes-Benz Sprinters distributed by Mercedes. The discontinuation of the Freightliner Sprinter constituted a line-make withdrawal under the Wisconsin Motor Vehicle Dealer Law, which brings the termination of River States' dealer agreements under § 218.0132, not § 218.0116. Accordingly, defendants are entitled to summary judgment on all of River States' claims under § 218.0116.

River States did not bring any claim under § 218.0132. Daimler Vans recently filed a motion for leave to file a supplemental pleading to add a counterclaim against River States for declaratory judgment under § 218.0132(2)(d)(2). It also seeks leave to deposit $400,000 with the court under Rule 67 of the Federal Rules of Civil Procedure. Daimler Vans seeks a declaration that the $400,000 would satisfy any statutory obligation it has to compensate River

States for the line-make termination as required by § 218.0132. River States does not oppose the motion, but the court will deny Daimler Vans' motions based on Daimler Vans' undue delay. *See Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008) ("district courts have broad discretion to deny leave to amend where there is undue delay").

Daimler Vans says that it could not bring its counterclaim earlier because it did not offer River States $400,000 compensation until March 28, 2022, and River States did not reject the offer until April 15, 2022. But Daimler Vans does not explain why it waited until March 28 to offer compensation to River States. The parties have known since before this case was filed, in December 2020, that there would be a dispute about whether the franchise terminations fell under §218.0116 or § 218.0132. They also knew that they disagreed about the amount of compensation Daimler Vans owed to River States. But neither party attempted to plead a claim under § 218.0132 until Daimler Vans filed its motion for leave to add a counterclaim, on May 5, 2022, just over two months before trial is scheduled. Daimler Vans has identified no reason why it could not have added a counterclaim sooner.

Daimler Vans says that its counterclaim would not require an alteration in the case schedule, but the court is not persuaded. All of the current claims in this case will be resolved by this summary judgment decision. Adding a counterclaim to this case would require starting this case over with new claims and a new schedule. The court declines to do so. If the parties cannot resolve their dispute about the compensation owed to River States, they may file a new lawsuit.

ORDER

IT IS ORDERED that:

21

1. Defendant Daimler Vans USA, LLC's motion for leave to file a supplemental pleading and deposit funds with the court, Dkt. 111, and motion to file a reply brief, Dkt. 117, are DENIED.

2. Defendants Daimler Vans USA, LLC and Mercedes-Benz USA LLC's motion for summary judgment, Dkt. 60, is GRANTED.

3. Plaintiff River States Truck and Trailer, Inc.'s motion for summary judgment, Dkt. 54, is DENIED.

4. The clerk of court is directed to enter judgment for defendants and close this case.

Entered May 23, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge